What would you call the first case of the morning? The first case for argument this morning, Tuesday, May 17, 2016, is 15-1786, District of Minnesota, Millennium Operations Incorporated, et al. v. Super Value Incorporated, et al. Okay, Mr. Coons, good morning. Good morning, Your Honors. My name is Eric Coons, and I am representing the defendant's appellants in this appeal, C&S Wholesale Grocers and Super Value. As Your Honors know, this appeal relates to the enforceability of an arbitration agreement or arbitration agreements that plaintiffs do not dispute that they signed and that govern their wholesale grocery supply relationship. The Eighth Circuit has held, as have virtually every other court in the country, that the FAA establishes a strong national policy in favor of arbitration. The Supreme Court has similarly held in the Litton case that we've cited throughout our brief that there is a presumption in favor of post-expiration arbitration unless negated expressly. And where there are any doubts, according to the Eighth Circuit, concerning the scope of arbitrable issues, they should be resolved in favor of arbitration. One of the arguments that the appellants have asserted here, Your Honors, is that the arbitration agreements are directly enforceable. The appellees have argued that this argument is not properly before this court, and we respectfully disagree. As we argue in our briefs, Your Honor, we clearly argued in the first appeal that was before Your Honors on these arbitration issues that with respect to Millennium and Village Market, those are the plaintiffs in this case, Super Value and C&S could enforce those agreements directly without relying on any of the doctrines permitting non-signatories to enforce the arbitration agreements. So that argument was absolutely asserted in the first appeal in this case. Notwithstanding that, or regardless of that, as appellees in the first appeal, we were not obligated to raise every possible cross-appeal that we could have. In fact, the Eighth Circuit has held in the Castellanos case that we cite that it would be absurd for appellees to assert every possible cross-appeal that they could. It would cause congestion. It would be unnecessary. So we believe that the direct enforcement argument is squarely before this court, and there's no procedural bar to that. We also obviously think that the direct enforcement doctrine applies to the facts in this case. And we think that the Litton and Koch case, the Eighth Circuit and the Supreme Court cases, have a very broad presumption that would permit arbitration in this case. There's nothing in the Litton or the Koch case that would preclude an arbitration, for example, as we read the cases, where there is an assignment, for example, or for any other differentiating feature that might exist in this case. And Koch and Litton . . . I may be wrong, but I think this boils down to you having an arbitration agreement that you were not a signatory to and was signed away, and district court says, well, you don't own the rights to that anymore, is the yes and or. Why do you still retain the rights of an arbitration agreement that you've assigned away? Yeah, I do think that's really the crux of the issue here, Your Honor. And the reason that we think that that's the case is in part because we don't see anything in the Litton, Koch, or other cases that are cited by us or the appellees that would preclude it. I'm not sure that there is a case . . . Yeah, I was going to ask that. Do you have a case where . . . Yes. . . . it's directly on that? Yes, we do. Now, they're not Eighth Circuit cases, I'll concede that, but the Vancure . . . I'm not sure I'm pronouncing that right, but the Vancure case, Southern District of New York case that we cite in the brief, and the Stations West case, which is a District of Oregon case. But is this . . . this is controlled by Minnesota law, is that correct? It is, it is. Is there a Minnesota case that you have? That's what I'm kind of looking for here. There's no Minnesota case for either party, for either side here, that squarely addresses the issue of whether or not an assignment cuts off the right of the assignor to enforce arbitration. I think that there is a lack of direct case law for both parties on that, which then causes us to retreat to the Supreme Court case, to Litton and the Koch case, and then the persuasive authority that we cite that would . . . that clearly holds that an assignment clause will not cut off arbitration. In one of those cases, in the Vancure case, the Southern District of New York case, the assignment . . . the plain language of the assignment said that it was irrevocably assigned. And the court said notwithstanding the fact that there was an irrevocable assignment, there's a right to arbitration. And we think that makes sense from a policy perspective, too, not just under the law that we've cited and argued, but that if the . . . what the appellees are seeking, you know, from this court, which would be affirmance of the district court's case, we think that that would create perverse incentives here, because the point of the FAA is to encourage arbitration where it's a sound decision to do so. But if it's the case that an assignment automatically cuts off the right to arbitrate, even when you have facts that predate the assignment, which I can address if you'd like, we put them in the brief, it creates this perverse incentive where that just makes me want to counsel my client to say, just assign back to the original wholesaler what it is that you've assigned. The plaintiffs here have conceded that if they had sued the other wholesaler in this case, they'd be in arbitration right now. So, it creates this perverse incentive where we just assign back the rights to arbitrate, and then, you know, it creates massive inefficiencies. But this . . . is this different, though, because it's not . . . you're not seeking to arbitrate a particular term of the contract, whether or not the facts and circumstances predated the assignment? It's not a particular contract term we're talking about, is it? We're talking about the asset exchange agreement, which is sort of a standalone in a way. Yeah, I think that's generally right. It is . . . there is no particular . . . it's not a breach of contract case, for example. There's no particular term within the wholesaler contract relationship that is at issue. That said, I think that the case law that we cite, and, indeed, the case law that the Apple East cite, says that . . . well, two things. When you have a very broad arbitration provision like we have here, and as I think this Court recognized in the first appeal, that covers not just the contract, but the relationship. Then, it doesn't matter whether or not you're just arbitrating a contract term or not. It has to arise from the wholesaler relationship. And, I think that the case law establishes that, too. Even when you don't have . . . there are plenty of cases where the arbitration provisions are much narrower, where the courts, nonetheless, say that you're looking at the relationship, not just the contract. And so, for those reasons, I think that the conduct that's at issue here, would fall within the scope of what is before the arbitrator. And, I don't understand the Apple East really to be arguing that there's an issue of scope, as opposed to whether or not it's enforceable. The issue of scope, I think, is . . . Well, there are two different arbitration clauses, aren't there? One for the super value agreement, and one for the other agreement. I think, technically, there are three, but . . . There are three. Yes, Your Honor. But, they're not all the same. They're not all the same. The scope of one is broader than the other two. Yes. So, on the super value agreement, which applies to any controversy, claim, or dispute of whatever nature arising between the retailer and super value, that's the broadest, I think. Would you agree? I think it is, with one possible qualification. The arbitration agreement that relates to Millennium talks. It says, specifically, that the arbitration agreement would, quote, survive the rescission or termination of this agreement. I see. So, on the question of survival, it might be more specific. Yes. I guess that's a separate issue. So, I would agree with you that . . . So, on the super value agreement, when would you say that the controversy, claim, or dispute arose between the retailer and super value? Well, I think, based on the plaintiff's own allegations, that the earliest . . . Excuse me. The latest that the controversy would have arose was in July of 2003. And so, the timeline here, I think, is important. And there's a number of pre-assignment . . . Just so we're clear on the timeline, July of 2003 and the assignment of the agreement happened when? That happened in September of 2003. Specifically, September 13th of 2003. So, you say that this controversy arose before the agreement was assigned and, therefore, the agreement to arbitrate applies. I think that's right. And I would quickly follow up with . . . So, there's a July 20th, 2003 email that the plaintiffs cite frequently as the secret agreement or the side agreement or the real agreement. And that is an all-in agreement. According to Village Market, they say, you know, either that set of emails or the AEA, which was signed before it closed. And the assignments happened at the closing, not at the signing. So, the AEA also happened before the assignment agreements were executed. You're saying, under the plaintiff's theory, this conspiratorial agreement was in effect before the assignment of the arbitration agreement. Absolutely. I think all of the levers, by the plaintiff's own allegations . . . They say it's a one-shot deal. That one shot happened before the assignment. All of the levers of the alleged conspiracy had been pulled to set in motion everything that they alleged happened well before the assignments. By several months, in fact. Now, the other agreement, the CNS agreement, as I recall, is narrower on scope. And it speaks about disputes arising out of the agreement, doesn't it, or out of the contract? The CNS agreement states that any controversy, claim or dispute of whatever nature, arising between Village Market and Super . . . Oh, sorry, Super Valley. It states that it will relate to all disputes relating to this agreement. That's the Millennium . . . Yeah, the Millennium document. And then, the Nemechek . . . Sorry. Didn't our first opinion say, well, these don't relate to the contract. These are antitrust claims, and so they wouldn't be covered by the scope of that clause? Yes, in a different context, though. Well, yes is the first part of your question. Yeah. The first decision that the court had that rendered related to the equitable estoppel argument. Right. I understand it was a different context, but would the reasoning also mean that the dispute here is outside the scope of that Millennium clause? I don't think it does. I don't think it does because . . . Why not? Because it doesn't matter. We think the law that we cite states that it doesn't matter whether or not . . . Well, it would be inappropriate to focus just on the agreement, that the law looks at the relationship of the parties that comes out of that agreement. And I think that the language of this court that you're referring to, Your Honor, had in relation to the equitable estoppel argument, it necessarily had to look at whether the facts were intertwined with the language of the contract for purposes of equitable estoppel. That was a different analysis. And here, I think that the issue is whether or not the scope of the relationship, and I haven't talked about the close relationship doctrine, but whether the scope of the relationship, both in the close relationship doctrine or the direct enforcement doctrine, comes within the purview of arbitrability. And if there's any doubt, as the Eighth Circuit has held, then arbitrability should be found. Unless Your Honors have further questions, I would reserve the rest of my time for Rubato. Okay. You may. Thank you. I'd like to divide up your time, Mr. Drubel. Good morning. Good morning, Your Honors. May it please the Court. My name is Richard Drubel, and I represent Millennium Operations, Inc., the plaintiff at Pelee in this matter, a small retail grocer in Minnesota that operated three stores at the time of the asset exchange agreement. Millennium has sued C&S Wholesale Grocers, Inc. for C&S's agreement with the second largest grocery wholesaler in the country, Super Value, not to compete in the Midwest. Millennium has never had a supply agreement with C&S. Millennium has never had an arbitration agreement with C&S. Indeed, Millennium has never had any agreement of any type with C&S, nor has Millennium ever been supplied by C&S. I note that my colleague, Mr. Coons, says that the critical issue here is the wholesale relationship. Well, C&S never had a wholesale relationship with Millennium. C&S never supplied Millennium. Although C&S has never had an arbitration agreement with Millennium, it nevertheless is trying to enforce an arbitration agreement that Millennium had with its previous supplier, Fleming. C&S's entire argument for its claim to be able to enforce the Fleming-Millennium arbitration agreement rests upon an inaccurate premise, namely, according to Defendant's brief at 6, that C&S actually acquired the Fleming-Millennium agreement when it purchased certain assets out of bankruptcy with Fleming. Defendant's brief at 6 cites a number of records, none of which remotely support the conclusion that C&S actually acquired this agreement. Well, their best document is probably your complaint, don't you think? Depending upon how you read the complaint. How do you read it? Well, Your Honor, I think, charitably read, it doesn't distinguish finely enough between C&S causing the Fleming assets to be assigned to super value. But the answers to the complaint certainly make the distinction where, as we cite in our brief, super value admits that it acquired the Fleming agreements from Fleming, not from C&S. So you're saying the complaint might be imprecise on distinguishing between cause and actual assignment? The complaint could have been better written on that part. I certainly can see that. But you say, in reality, what happened is the assets never went to C&S and the agreement never went to C&S. It went right from Fleming to super value? Absolutely. And, Your Honor, if one looks at the asset exchange agreement, for example, section 1.1, which is at appendix . . . this is defendant's appendix 11. Quote, C&S shall use reasonable best efforts to cause Fleming . . . Fleming, not C&S . . . to convey, assign, transfer, and deliver directly to super value the assets described in this section. It's hard to get much clearer than that, but it's . . . the fact is that this is underlined in the very next section, in section 1.1A, also at appendix . . . defendant's appendix 11, where super value acquired, quote, all of Fleming's right, title, and interest in the acquired contracts. Fleming's right, title, and interest in the acquired contracts, not C&S's. If C&S were right, that they acquired these contracts and then somehow passed them off to super value . . . the asset exchange agreement would not talk about acquiring Fleming's right. It would talk about acquiring C&S's rights. But, it doesn't. It talks about all of Fleming's right, title, and interest. The bankruptcy order, in this case, approving the sale . . . that's the September 9, 2003 order . . . talks about authorizing, quote, selling debtors, which would be Fleming . . . to, quote, assume, assign, to super value the Fleming contracts. And, that's at plaintiff's appendix 125. This Court's May 21, 2014 opinion, the last opinion on these appeals . . . notes as follows, 752 F. 3rd at 730, quote . . . C&S agreed to designate super value to receive Fleming's Midwestern assets. I think it's pretty clear from the bankruptcy record, from the defendant's own documents . . . from this Court's prior opinion . . . that C&S simply has not carried its burden of showing that there is a valid arbitration agreement . . . between C&S and Millennium. Because, C&S never actually acquired the contracts in question. Now, let me talk a little bit about Litton and Koch. Of course, your Honors are aware that neither Litton or Koch deal with the effect of an assignment . . . on the ability of an assignor to retain rights that were assigned. Litton involved a dispute between two signatories to a contract. And, Koch involved a dispute between the assignee of a contract who wanted to retain . . . who wanted to invoke arbitration, and a signatory. That has nothing to do with the issue in this case about what assignment does to cut off the rights of an assignor . . . who freely and completely assigned the rights under a contract. I would also note that under Litton, my colleague says, well there's a presumption of post-expiration arbitration. Well, that's true. But, Litton itself says that only applies only where a dispute has its real source in the contract. And, that's at page 205 at Litton. As this Court has already decided with respect to similar contracts . . . super value contracts that were at issue in the last arbitration appeal . . . this dispute does not have its source in any supply agreement. This dispute has its source in an agreement between competitors not to compete in the Midwest. That's a statutory claim that is completely independent of any agreement. And, certainly the agreement is here. Okay. Your time has expired. Thank you, Your Honor. Thank you. Good morning, Mr. Dangle. Good morning, Your Honor. May it please the Court, it's an honor to be here before you today. I think this case . . . I submit this case is controlled . . . by the very question that the Court asked in remanding this case . . . which is, can CNS or in my case, can super value maintain that it's a successor in interest . . . in some way, to the very agreement it assigned. And, the answer to that is clearly no. And, that has implications for all of the issues raised in the case, it seems to me. First of all, this is controlled by Minnesota law. The restatement of Contracts 317, Subsection 1, makes it clear that . . . when an asinore assigns all of his rights to performance under an agreement . . . that his rights, that is the asinore's rights, are extinguished. Minnesota law, there are several cases cited in my brief, that say that again and again. And so, the question is, it seems to me, the law being clear . . . and it being clear that the parties did not draft into the agreement . . . that arbitration continued after an assignment or termination of the arbitration agreement . . . can the, can super value, in some way, find that there was an implication or make an inference . . . that the parties agreed, somehow, that even after an assignment . . . there would be some continuing right to arbitrate. Stolt-Nielsen, the Supreme Court indicated, it seems obvious, but it was good that it was restated . . . that arbitration is a matter of consent, of agreement. And, as this Court already stated at page 924 of the first appeal . . . these antitrust conspiracy claims do not involve the terms of the contract. The face of the contract does not provide the basis for the alleged injuries . . . and there's no evidence that the contract anticipated the precise type of relationship giving rise to the claims. There's simply no way to say that my client, the Village Markets, agreed in any way. They did agree to free assignment. But, they agreed to arbitrate a claim or dispute of whatever nature, not just one arising out of the contract. But, I think that what that clearly means, Your Honor, is it's a dispute between the parties . . . The question is, once you've assigned it, is it still subject to the arbitration agreement? That's a different point. But, you're saying if there had been a dispute, just based on the supply agreement . . . that occurred entirely before the assignment of the arbitration agreement . . . and then, your client brought an action after the assignment of the agreement . . . that it would not be arbitrable. That's what I'm saying. Yeah. So, you're all . . . You're not saying that the antitrust claim is outside the scope of this clause, if the agreement had not been assigned. Oh. Because, it is a claim arising of whatever nature, between the parties. It would stretch it, but let me put it this way. We do not dispute that CNS, which received the assignment, has the right to arbitrate. All right. All right. So . . . So, if there was a claim as to the supply agreement itself, whether it's lack of payment or something very specific to the contract . . . that, too, would have been assigned to . . . If it was . . . the assignment . . . If it was . . . If it was something that arose before . . . that fully arose before . . . and that involved interpretation of the contract in some way, or a vested right under the contract . . . there would be . . . certainly, there would be a case against the assignee. What I'm saying is that there's no case . . . no indication that the assigneur still would have the right to arbitrate, having assigned it. That's what I'm . . . Completely. Completely. Why not? Why not? If they agreed to arbitrate it, while it . . . and it occurred while the agreement was in effect . . . Why do they lose the right to arbitrate any more than they lose if the agreement had terminated? Because they agreed to assign it. They agreed. Well, they also agree in the termination . . . Like my client . . . But, in the termination cases, they agree that it expires as of a certain date. My client agreed that the contract could be assigned. My contract . . . my client did not agree in any way that once assigned . . . that both the assigneur and the assignee get the benefit of arbitration. They didn't agree to that. But, I'd like to . . . Is your point that if you have a contract where you assign all your rights to the assignee, that includes all causes of action of whatever kind . . . Yes. And, if they wanted to reserve a Sherman Act claim, they should have put that in the contract and say, we reserve any antitrust claims we may have. Absolutely. So, that's your point? That is my basic point, Your Honor. But, I'd like to . . . Why would they want to reserve an antitrust claim? They're just saying, we have a right to arbitrate. They could . . . No. They could . . . As in Lytton, they could have reserved a wrongful termination claim that didn't arise directly under the contract. No. I'm sorry, Your Honor. As a matter of fact, I just wanted to answer the court's question that you asked of the other counsel as to whether or not the cause of action arose before the transfer. Because, that's one of the items and that relates to this. In other words, rather than hypothetically, it might have arisen before. What happened here that's critical, the gravamen, the heart of the case, as it were, is that after making an agreement, Super Value, in fact, did stay away from the New England jurisdiction for five years. As I'm sure you know, the case law is laden with cases where an agreement is made, but never carried out. Or, an agreement is made and carried out for a while, and then it ends, and then it cheats. The cheating occurs. The heart of the matter here, the reason why there is a cause of action, is because they stayed away and there were overcharges after the agreement was made and after the assignment was made. So, I would say this did not arise before, unless you want to take what are the conditions for an antitrust violation happening. They agreed, a handshake or whatever. Excuse me, my time is up. Finish your comment. Thank you, Your Honor. Unless you want to use things that are really preconditions or conditions to the tort violation here, to the overcharge, to the fact they stayed away. Unless you want to say any preconditions, any events that occur, a handshake, a signed AEA, whatever, is the basis for the cause of action. It seems to me that the questions you've been asking about pre-agreement behavior don't matter. And it seems to me that whatever the language in passing of Lytton is, the way the cases have applied it, is that unless in some way the cause of action actually arose before the transfer, the basis for the cause of action, full basis for it arose, the heart of the matter arose. The cases have not indicated that arbitration is required. Thank you, Your Honor. Thank you. Mr. Coons, I think you have a couple minutes. I need to make it quick, I see. I wanted to first address Mr. Drubel's arguments that CNS was never a party to an arbitration agreement. I believe that the complaint is somewhat clear on this point. More importantly, at Appendix A101, Millennium itself, in Section E of that document, recognizes that all of the assets, including the agreements which contain the arbitration provisions, were in the possession of CNS. So I think there's a complaint admission, there's A101 admission, and there's a common sense point that CNS paid $400 million for this stuff. That is undisputed. And at some point thereafter, SuperValue, or excuse me, CNS paid for it. SuperValue then paid CNS $400 million for those assets. And to argue that CNS never took possession of the assets and the agreements and the arbitration provisions I think just defies common sense. Now, could you address Village Market's argument that they never contemplated that both the assignor and the assignee would be allowed to compel arbitration? Is it your position that the assignee can compel arbitration for matters that occurred before the assignment? And the assignor also can compel arbitration for matters that occurred before the assignment? Or is there some way that this- Unfortunately, I haven't thought much about whether the assignee could do so because I don't think that issue's before you, but- Well, of course, in the sense you're asking us to construe this, how this agreement applies. And he's saying it wouldn't be right to say that both parties can compel arbitration over the whole period of time. Yeah, and I'm not suggesting that both parties should have that right. I'm not foreclosing the possibility that could happen, but as I understand- Well, how do you think our opinion should read on that point? That an assignor has the right to enforce an arbitration contract notwithstanding an assignment. What about the assignee? I think that if the assignee could certainly enforce it for conduct that happened post-assignment, and that's where you have a situation, whereas here, where you've got the assignor in a relationship- What about, my question is, typically these contracts, and I haven't looked at the language in your contracts, but the seller conveys all their rights, they serve all their causes of actions, all their rights to the buyer. And here you're wanting to go back and allow one of those rights, which is arbitration over, you're saying, a claim that occurred during their ownership of the right. Why is that not just basic contract law? Once you assign all your rights, they're gone. Well, I think that is maybe where the party's real argument is here, that under basic contract law, it is generally the case, and that's what the restatement says, that's what a number of the Minnesota cases state, that Mr. Dengel referred to for the New England plaintiffs. But in the context of an arbitration, where you've got this federal overlay with the FAA, and for the reasons stated in the Vancure and the Stations West case, the arbitration is a special animal that requires something other than the general rule. And an analogy that I would use for your- Now, this is really going back in my memory, but in the Federal Arbitration Act, I thought it also says otherwise the rules of equity and law and so forth apply and so forth. There's some language in there about that. So assuming that's true, doesn't that bring back in just basic contract law? I don't think that given the, for example, the Litton and the Koch cases' statement that, for example, if there's any dispute between whether it's arbitrable or not, I think that necessarily dictates that arbitration clauses are treated differently. They're not treated like every other contract provision. And an analogy I would use to answer your question, Your Honor, is if you have a confidentiality provision, for example, let's say the confidentiality provisions that existed in an agreement, and that agreement is then signed, it would be absurd to say that once the assignment happens, the signatory to that contract could then explode confidentiality or forum selection or choice of law. So there are, I think there are a number of contexts within a contract where it makes sense. I think the law supports it, but it also, there's a lot of common sense saying that's different. That is different because it doesn't make sense to say that you can now explode confidentiality because of an assignment. That goes back to my question. I know there's nothing in Minnesota that I've seen in the materials, but is there any, on that narrow issue, is there any case that has said that the ASINOR retains its right that the arbitration, Federal Arbitration Act and policy is so broad that you still retain it, ASINOR still retains it? Within Minnesota or within the Eighth Circuit? Well, first Minnesota, but then anywhere. Well, not in Minnesota, nothing that specific. Now, I don't want to give up on the point that I think that Minnesota law in general and Eighth Circuit law in general embraces the sanctity of arbitration clauses, and therefore there's something special about those. The cases that specifically head-on deal with whether an assignment cuts off the right to arbitration would be the Vancure case and the Stations West case, Southern District of New York and District of Oregon, that both say, yeah, arbitration survives, including in the context in the Southern District of New York case where it said that all rights and responsibilities are . . . I'm not quoting right now, but an unqualified assignment of all rights, which the opposition in that case argued, well, clearly if it's saying you're assigning everything, that means you don't retain, as the ASINOR, the right to arbitrate, and the district court said, no, that's wrong. Arbitration will . . . you know, they ordered arbitration in that case. Okay. Time's expired. Thank you, Mr. . . . Thank you for your time. Mr. Coons, appreciate it. Thank you both for your arguments, both the briefs and the oral arguments today. We'll take it under advisement. Thank you.